THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HIRAM GILMORE, Plaintiff in Error.

*Opinion filed April 20, 1916.*

1. LOCAL OPTION—*when clubroom may be abated as a common nuisance.* The rooms of a social club situated in anti-saloon territory may be abated as a common nuisance, under section 14 of the Local Option law, if club members are allowed to drink beer taken from a common stock, even though the rules of the club purport to restrict each club member to the drinking of his own liquor.

2. SAME—*what not essential to conviction of person for keeping a common nuisance.* In order to convict a person of keeping a common nuisance in the form of a clubroom where beer is distributed to members it is not essential that he have absolute control of the premises, and it is sufficient if, as treasurer of the club and, in effect, its manager, he knew that the club members frequently drank beer taken from a common stock.

WRIT OF ERROR to the Appellate Court for the Second District;—heard in that court on writ of error to the County Court of DeKalb county; the Hon. DAVID T. SMILEY, Judge, presiding.

J. C. JAMES, (THOMAS M. CLIFFE, of counsel,) for plaintiff in error.

P. J. LUCEY, Attorney General, LOWELL B. SMITH, State's Attorney, and EUGENE P. MORRIS, (E. M. BURST, of counsel,) for the People.

Mr. JUSTICE CARTER delivered the opinion of the court:

At the October term, 1914, of the circuit court of De-Kalb county an indictment containing eleven counts was returned against Hiram Gilmore, the plaintiff in error. The first ten counts charged him with selling intoxicating liquor unlawfully in anti-saloon territory at various times. The eleventh count charged him with keeping a place which became and was a nuisance by reason of his unlawful sales of intoxicating liquor therein. The indictment was transferred to the county court. Plaintiff in error plead guilty to the first three counts and judgment of guilty was rendered against him and fines assessed, which were paid in open court. The remaining counts, except the eleventh, were dismissed by the State's attorney. A jury was waived and the cause submitted for trial on the eleventh count before the court, on a written stipulation of facts entered into by the parties herein. Plaintiff in error was found guilty on this count by the court and sentenced to pay a fine and to twenty days' imprisonment. It was further adjudged that the place so kept by him as a common nuisance be abated until Gilmore gave bond, with security approved by the court, conditioned that he would not sell intoxicating liquor contrary to the laws of the State. A writ of error being sued out from the Appellate Court for the Second District, this judgment was affirmed. Thereafter this writ of error was sued out to review the judgment of the Appellate Court.

Some question was raised by plaintiff in error in the Appellate Court as to whether he could be rightly convicted on

the eleventh count after he had plead guilty and paid his fine on the first three counts of the indictment. That point is not raised in this court, the sole question here being whether, on the facts as stipulated, plaintiff in error could rightfully be adjudged guilty of keeping and maintaining a nuisance, as charged in said eleventh count.

On May 7, 1914, the town of Sycamore became anti-saloon territory. Prior to that date plaintiff in error, Gilmore, had occupied the first floor of the building described in the said eleventh count of the indictment and had conducted there a saloon, in which he sold, both at wholesale and retail, lager beer manufactured by the Aurora Brewing Company, a corporation having its brewery and principal place of business in Aurora, in Kane county. The saloon fixtures in said building were owned by said brewing company. Gilmore's lease on the first floor of this building expired July 1, 1914. August 1, 1914, a lease of said floor was taken by the Aurora Brewing Company for two years, at a rental of $55 per month. This company proceeded at its own expense to divide the floor into two parts by a partition. The rear part, consisting of two rooms, it sub-rented to an unincorporated organization called the "Sycamore Social Club," which was organized in Sycamore about August 15, 1914, largely through the efforts of Gilmore. The front room of said first floor was leased by the brewing company to the Fox River Express Company, the rental for this room, together with a warehouse located some blocks away and also leased to said express company, being $20 a month. The Sycamore Social Club paid $10 a month for the two rooms in the rear. This club started with about twelve members, but its membership had increased to about a hundred at the date of the indictment in this case and included men in various walks of life. It had a president, secretary and membership committee. Gilmore filled the office of treasurer and was also on the membership committee, which had absolute control of the admission of new

273 — 10

members. While no one was supposed to be admitted to membership without a two-thirds vote of this committee, yet some were admitted by Gilmore at the time they made. application to him. Many applications were made to him, and sometimes he told the applicants to wait a day or two, during which time they were voted on by the committee. A number were refused admission. Men deemed desirable as members were solicited by the membership committee to join the club. In many cases Gilmore was the member of the committee who informed the applicant of his admission. The members paid an initiation fee of fifty cents and monthly dues of twenty-five cents each in warm weather or thirty-five cents when the weather was cold. Members could enter the clubrooms on any day, including Sunday, between the hours of 7 A. M. and 11 P. M. Each member carried a key to the door from the express office into the clubrooms. In these rooms were settees, chairs and tables and some of the saloon fixtures formerly used by Gilmore, including the ice-box which he had used and which he presented to the club. No use was made by the club of the bar formerly used in the saloon except as a support for a double row of lockers on top of it. Other lockers were placed in various parts of the room. The Aurora Brewing Company gave these lockers to the club. No person except a member of the club was permitted to enter the rooms, the door being kept locked and marked "For Members Only." There were no bottles or glasses or other equipment for drinking about or behind the bar and no glasses or glassware about the club except bottles. There was no bartender, porter, waiter or other person to serve drinks or in any manner wait upon the club members.

On or about August 8, 1914, Gilmore was appointed agent of the Fox River Express Company at the city of Sycamore at a salary of $75 per month. The office of the express company of which he took charge was located im-. mediately in front of the clubrooms of the Sycamore Social

Club on the first floor of said building and separated from them only by a partition. A man named Charles Hurley, who had formerly worked for Gilmore as a driver, became driver for the Fox River Express Company at Sycamore and was also elected secretary of the Sycamore Social Club and its custodian, being assisted in the performance of the latter duties by Gilmore. Cigars, tobacco and snuff were kept in a show-case in the express company's office and sold by Gilmore to the club members and others. On the show-case in the office were kept printed blanks for ordering beer, furnished by the Aurora Brewing Company and directed to it, and envelopes addressed to said company. These blanks and envelopes were also found in the rooms of the club. When a person became a member of the club he usually filled out one of these order blanks under the direction and with the assistance of Gilmore, stating the amount and kind of beer he desired, and also purchasing, if he desired, a postage stamp from Gilmore. He could then mail the order himself or place it in a private mail-box of the express company in the office. At different times Gilmore would call the postman and request him to come for the mail in this box. The only way in which beer was ordered by club members was by filling out one of these order blanks. It appears from the stipulation that persons who were not club members sometimes filled out these orders and mailed them to the Aurora Brewing Company. When club members ordered beer it was usually delivered at the club, but when a person who was not a member ordered, the beer was delivered through the agency of the express company to the residence of such person. The one who filled out an order applied to Gilmore for an express money order or check for an amount sufficient to pay for the liquor ordered and twenty-five cents express charges for delivery, and thereupon either Gilmore or Hurley issued to such applicant a money order or check in the name of the Fox River Express Company, signed by Gilmore as agent and

payable to the applicant, for the amount requested. For each such order the express company charged a fee of three cents, which amount, together with the amount of the money order, was paid by the applicant to Gilmore, who remitted it to the express company. The money order, indorsed by the payee, was then enclosed by him, with the order for beer, in one of the addressed envelopes furnished by the brewing company and mailed to the company. Upon receiving the order for the beer the brewing company entered it on its books and placed the number of cases of beer ordered, marked with the name and address of the person ordering it, upon its shipping platform in Aurora. These cases were turned over by it to the Fox River Express Company and forwarded by the latter company to the consignee at Sycamore, sometimes by auto truck or wagon belonging to the express company but usually over the Northwestern railroad. At Sycamore the beer was received by Gilmore, as agent for the express company, and delivered by him to the consignee. If delivered outside of the club-rooms Hurley usually took it. If the consignee was a member of the club, the beer was placed, usually by Gilmore but sometimes by the member, in the member's locker in the clubrooms. The beer was not delivered the same day it was ordered and no orders for beer went otherwise than through the mail to the brewing company. The average amount of beer ordered by the members of the club was about two or three cases per week per member. Some of the orders were for two, three or five cases at a time. Each case contained twenty-four pint bottles. The Aurora Brewing Company was the only company to which the members of this club sent orders for beer. They paid higher for such beer than the regular retail price. When a member ordered more beer than his locker would accommodate, the surplus was stored by him at the club.

The Fox River Express Company is an Illinois corporation chartered to do business as a common carrier, with

a capital stock of $10,000. No part of this stock is owned by any officer, director or stockholder of the brewing company. On or about July 1, 1914, the express company was re-organized by S. C. Rupp, who had for a number of years theretofore been connected with the United States Express Company. An employee of the Aurora Brewing Company was president of said express company. Its principal office was established in a building in Aurora leased to the Aurora Brewing Company and in which said brewing company had a branch office. There is one street door leading into the store in which the offices both of such express company and the brewing company are situated. On the street door appears the name of each company. The street door opens into an entry in which there are two inner doors, one leading to the office of the express company and the other to the office of the brewing company. The freight carried by said express company, up to the time of the indictment, consisted almost entirely of lager beer, with some whisky and other intoxicating liquors, and the only beer this company handled was that manufactured by the Aurora Brewing Company. With the exception of a few shipments of potatoes, groceries and mineral water, the only freight which the express company had transported into DeKalb county up to the time of the indictment had been intoxicating liquor. The record shows that the company held itself out as reserving the right to refuse to deliver shipments for transportation. The principal office of said company in Aurora is in so-called "wet" territory. About four-fifths of the territory in which the express company is authorized to do business is so-called "dry" or anti-saloon territory.

After a new member of the Sycamore Social Club had an order for beer filled and the beer placed in his locker he would take a few bottles out and place them in the ice-box in the clubrooms, one side of which was marked "hot" and the other "cold." He would place his bottles in the side marked "hot" and then he would take a bottle from

the side marked "cold" to drink. The rules of the club required each member to mark all bottles, before putting them into the ice-box, with the number of his locker and to remove only bottles marked with his own number. This rule, however, was not observed in practice, and the members often neglected to mark their bottles before putting them into the ice-box. Before all the bottles of cold beer had been removed from the cold side, the janitor or any member of the club would raise the partition in the middle of the box and push the ice into the side marked "hot" and then change the marks "hot" and "cold" on the lids. The ice was purchased and paid for by the club, costing, on an average, four dollars per month. It is clear from this record that the members, in taking the bottles of beer from the cold side of the ice-box, often took any bottle without reference as to what person owned it, as the bottles were often not marked in any way. Plaintiff in error had no beer of his own in the ice-box. The total income of the club, which was derived wholly from the dues of the members, was used in paying the running expenses of the club. The plaintiff in error, as treasurer, received the dues and paid the current expenses of the club, keeping his accounts as treasurer in a book open to the inspection of the members. Up to the time of the trial he had made no official report to the club of his accounts as treasurer. He collected the empty bottles and placed them in the warehouse of the Fox River Express Company at Sycamore until he had enough cases of empty bottles to amount to a car-load lot, when they would be shipped by the Fox River Express Company to the Aurora Brewing Company. The stipulation of facts stated that Gilmore would testify that he received no rebate, commissions or payment from said Aurora Brewing Company and had no interest in the sale of said liquor; that the State had no direct evidence to the contrary, but relied upon the facts and circumstances shown by the stipulation to contradict Gilmore's testimony in this re-

gard.  No internal revenue special tax stamp or receipt by the United States has been issued to the defendant, to the club or to any other person as a wholesale or retail dealer in liquor at Sycamore since the town became anti-saloon territory.

Section 12 of the act for the creation of anti-saloon territory reads, in part, as follows:  "Whoever shall, by himself or another, either as principal, clerk or servant, directly or indirectly, sell, barter or exchange any intoxicating liquor in any quantity whatever, within the limits of any political subdivision or district in this State, while the same is anti-saloon territory, shall be fined not less than twenty dollars ($20), nor more than one hundred dollars ($100), or imprisoned in the county jail for not less than ten (10) days nor more than thirty (30) days, or both, in the discretion of the court."  (Hurd's Stat. 1913, p. 1028.)  Section 13 of the same act reads as follows:  "The giving away or delivery of any intoxicating liquor for the purpose of evading any provision of this act, or the taking of orders or the making of agreements, at or within any political subdivision or district while the same is anti-saloon territory, for the sale or delivery of any intoxicating liquor, or other shift or device to evade any provision of this act, shall be held to be an unlawful selling."

Counsel for the State argue at length that on the facts shown in this record no other conclusion can be reached than that the express company here in question is not a real express company but was organized as a shift or device by the Aurora Brewing Company to avoid the provisions of said act under which the town of Sycamore became anti-saloon territory; that a computation of the expenses of said club, even after it had a hundred members, shows that the income from the members is less than the expenses of carrying on the club.  Counsel for plaintiff in error insist that said express company is a real corporation for conducting a general express business, and that the ordering of

liquor from the Aurora Brewing Company by the members of this club, with the advice and assistance of the agent of said express company, was not in violation of the Local Option law. In view of the conclusion we have reached on another branch of this case it is unnecessary for us to consider or decide this question or review the many authorities cited by counsel with reference to the point.

Even if the Fox River Express Company be conceded, for the purposes of this case, to be a genuine express company and the beer be conceded to have been delivered by the brewing company to the consignee in Aurora, we think the evidence in this case rightly justifies the verdict and judgment against plaintiff in error. From the stipulation of facts it appears that when a member placed his bottles in the "hot" part of the ice-box he usually did not place the number of his locker on the bottles, and therefore they were immediately merged in the common stock of bottles originally belonging to different members in that side of the ice-box, and when he took a bottle out of the side of the ice-box marked "cold," he had no means of knowing whether he took out his own bottle or one placed in the ice-box by some other member of the club. So far as appears from the stipulation of facts, there was no method of checking up when a member had used or drunk up the number of bottles that he had placed in the ice-box. So far as can be seen from the facts stipulated, a member could keep on taking bottles from the ice-box long after he had exhausted the number of bottles he had himself purchased, and, indeed, any member could take a bottle of beer out of the ice-box and drink it even though he had not placed a bottle in the side of the box marked "hot." In *Rickart* v. *People,* 79 Ill. 85, an association was formed for the ostensible purpose of promoting "temperance, friendship and good feeling." The members paid dues, had tickets with numbers to be punched for their drinks, and drank from a community stock, paying therefor, ostensibly at least, into the com-

munity treasury. This court sustained a conviction of the person who had charge of the clubrooms, declaring that it was a shift or device to avoid the provisions of the Dram-shop act. In *People* v. *Law and Order Club,* 203 Ill. 127, this court held that the dispensing of intoxicating liquors to the members of a club without having a license was a violation of the Dram-shop act. Intoxicating liquor was served to the members at actual cost, plus the expense of serving, and upon tickets representing the amount of the member's assessment by the club. This court held that the purpose for which the club was organized was immaterial; that if such a system or device could be tolerated it would render all legislation on this subject nugatory. In *South Shore Country Club* v. *People,* 228 Ill. 75, it was held that a social club, incorporated or unincorporated, which dispensed intoxicating liquors to its members, even though no profit was made, was within the meaning of the Dram-shop act, notwithstanding the club was organized in good faith for social purposes and not as a mere device to evade the statute. The court further said (p. 83) that "much ingenuity had been expended in attempting to show that the distributing or furnishing of liquors to members by a club is not a sale and that specious defenses of the character stated have received no consideration by courts except in prosecutions for the illegal sale of liquor." In the recent case of *City of Decatur* v. *Schlick,* 269 Ill. 181, the court had under consideration the violation of the provisions of the act here in question. In that case there was no club organized and no club dues, but about a hundred patrons of defendants ordered and bought from others, but not from defendants, beer in cases and whisky and other intoxicating liquors in bottles and caused the same to be delivered from time to time at defendants' place of business, and the defendants placed each man's supply in his separate storage place, labeled with his name, keeping a portion thereof on ice in the ice-box compartment bearing the name or number of the

owner. Such owner was served with his beer or whisky on request for himself and such of his friends or guests as accompanied him, and he paid defendants for the service, storage and accommodations. The defendants gave their entire time to the conduct of the business, also furnishing lunches, soft drinks, cigars and tobacco to anyone applying therefor. There was no sign in or about the place advertising the sale of lunches, and the principal part of the business of defendants was managing the distribution of intoxicants. They did this for profit and out of the profits paid the expenses of the place other than the original cost of the intoxicating liquors. This court held that the business so conducted was in violation of the Local Option law, and that the defendants were rightly convicted of maintaining a place which was a nuisance under said law.

Under these authorities there can be no escape from the conclusion that someone is guilty of violating the Local Option law in selling or giving away intoxicating liquor in the rooms of the so-called Sycamore Social Club. Beyond question, on the stipulated facts before us, plaintiff in error has taken the money, directed when and where the order should be mailed, received the beer, put it into the lockers and assisted the custodian in charge of the rooms. He has been, in effect, the manager of the club, knew that the liquors there drunk were taken out of a common stock, and was well aware of the fact that each man who was a member of the club frequently did not actually drink the liquor which he himself had purchased. To be found guilty under the eleventh count it was not necessary that plaintiff in error have the absolute or final control of the premises in question. He is certainly guilty as an accessory, if not as a principal, for violating the Local Option statute. Under section 14 of said statute the place where the law is violated is a common nuisance and may be abated as such.

The judgment of the Appellate Court must therefore be affirmed.                    *Judgment affirmed.*